UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 97-3410-CIV-LENARD/TURNOFF

MIAMI BATTERY MANUFACTURING
CO., as successor-in-interest
to Miami Battery & Electric
Company, and THOMAS A. CURTIS,

    Plaintiffs,

vs.

BOSTON OLD COLONY
INSURANCE CO., and as
successor-in-interest to
BOSTON INSURANCE COMPANY, and
CONTINENTAL CASUALTY COMPANY
as successor-in-interest to
CONTINENTAL INSURANCE COMPANY,

    Defendants.

_____/

## ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING PLAINTIFFS' MOTION FOR CLARIFICATION; GRANTING PLAINTIFFS' MOTION FOR LEAVE TO AMEND THE COMPLAINT NUNC PRO TUNC; SETTING THIS MATTER FOR MEDIATION CONFERENCE; AND DENYING ALL REMAINING MOTIONS WITHOUT PREJUDICE

THIS CAUSE is before the Court on Plaintiffs' Motion for Partial Summary Judgment, filed April 20, 1998; Plaintiffs' Motion for Clarification and/or Reconsideration, filed September 1, 1998; Plaintiffs' Motion for Leave to Amend the Complaint, filed January 12, 1999; Plaintiffs' Motion for Leave to File Additional Documents, filed March 17, 1999; and Plaintiffs' Motion for Status Conference, filed April 20, 1999. The Court having considered the motions, the responses, supporting affidavits and record evidence,

failed to participate in various settlement negotiations or authorize settlement payments within the policy limits that could have brought an early close to the EPA litigation and other parallel litigation that followed; and failed to provide payment once judgment was ultimately entered against Plaintiffs.

Plaintiffs filed this lawsuit on October 24, 1997 against the Insurance Companies, claiming each failed to defend or otherwise live up to various contractual obligations as set out in the policies. During the pendency of this lawsuit Plaintiffs settled all claims against American Home on February 25, 1998, and later settled with Sentry on October 26, 1998. Through filing a Second Amended Complaint on January 12, 1999, Plaintiffs' added Defendant Continental Casualty Company ("CNA") as successor-in-interest to Continental Insurance Company. Therefore, only claims against BOC and CNA remain.

Plaintiffs now seek clarification of certain previous orders of this Court, and specifically seek summary judgment against BOC on the claims of failure to defend and violation of the Florida Claims Administration Statute, Fla. Stat. § 627.426 (1995).

Granting Plaintiffs' motion for clarification/reconsideration, the Court first clarifies certain previous Orders and grants nunc pro tunc Plaintiffs' motion to file a Second Amended Complaint. Next, the Court finds BOC breached its duty to defend under the

3

policies, and therefore grants Plaintiffs' motion for partial summary judgment. Recognizing that this finding may be a condition precedent for stating additional claims against the Defendants, and that the Plaintiffs may seek to file additional claims, the Court provides an additional opportunity to file any amended complaint, reopens discovery for a period of 45 days subject to additional motion by either party, and sets this matter for a mediation conference. All pending motions not otherwise ruled upon in this Order are denied without prejudice, and leave is granted to refile in accordance with this Order.

### A.  Factual Background

Miami Battery and its President, Thomas A. Curtis owned certain real property in Medley, Florida where manufacturing and storage operations were conducted. (See generally Stat. Undisputed Mat. Fact ¶¶ 12, 21-26, & 27-29, incorporated in Pl.'s Mot. for Partial Summ. J., filed April 20, 1998.) Beginning in 1965, Pepper's Steel & Alloy, Inc. (Pepper's), a scrap equipment dealer, leased this property from Curtis and Miami Battery.

In October 1966, Pepper's began purchasing junk electrical transformers from Florida Power & Light Company ("FP&L") and processed them for scrap metal, storing the remaining metal and electrical parts on the property. Pepper's also purchased scrap

4

and otherwise advised in the premises, finds as follows.

## I.  Introduction

Miami Battery Manufacturing Company, as successor-in-interest to Miami Battery & Electric Company ("Miami Battery"), and Thomas A. Curtis filed suit in this Court on October 24, 1997 against Boston Old Colony Insurance Company ("BOC"), Sentry Insurance Company as successor-in-interest to Middlesex Mutual Insurance Company ("Sentry") and American Home Assurance Company ("American Home") (collectively "Insurance Companies").

Plaintiffs held general liability insurance policies issued by the Defendants during various policy years relevant to this action, including 1967-1976.  Plaintiffs ultimately incurred liability for environmental damage from pollution and toxic spillage at certain property in their control.  Various governmental investigations and subsequent cleanup resulted in numerous lawsuits, including actions brought by the U.S. Environmental Protection Agency against various landowners, including Plaintiffs, that resulted in a consent decree against Plaintiffs in excess of $6 million dollars.

Plaintiffs allege the Insurance Companies failed to defend against these lawsuits, contrary to the contractual obligations of the relevant policies.  Specifically, Plaintiffs claim the Defendants failed to pay certain necessary legal and related costs;

2

lead-covered copper cable and other miscellaneous scrap from FP&L for processing at the site.    These operations continued until approximately 1975.

The electrical transformers frequently contained oil that was contaminated with polychlorinated biphenyls ("PCBs"), a hazardous substance as defined by the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 et seq. (1994 ed. & Supp. I).  In opening the transformers, some of the oil containing PCBs was discharged directly onto the surface of the ground at the Pepper's Steel site.  In turn, these pollutants spilled over onto adjoining property.  As a consequence of this spillage, considerable quantities of PCBs, lead and other metal pollutants contaminated the Curtis/Miami Battery, Payne and nearby properties.  The environmental damage to the area was considerable and eventually resulted in designation as an EPA "superfund" site.[1]

Acting on an anonymous tip, in December 1982, the Dade County Department of Environmental Resources Management ("DERM") began investigations into the alleged presence of PCBs on and under the

---

[1]For additional history of this case, see Payne v. United States Fidelity & Guar. Co., 625 F. Supp. 1189 (S.D. Fla. 1987) (Spellman, J.); United States v. Pepper's Steel and Alloys, Inc., 658 F. Supp. 1160 (S.D. Fla. 1987) (Spellman, J.); Pepper's Steel & Alloys, Inc. v. United States Fidelity & Guar. Co., 668 F. Supp. 1541 (S.D. Fla.) (Spellman, J.); United States v. Pepper's Steel and Alloys, Inc., et al., Case No. 85-0571-CIV-PAYNE (S.D. Fla. Jun. 14, 1995) (Omnibus Order on All Pending Motions); United States v. Pepper's Steel and Alloys, Inc., et al., Case No. 85-0571-CV-DAVIS (S.D. Fla. Oct. 16, 1997) (Consent Decree) (hereafter "1997 Consent Decree").

Pepper's Steel Site.    These investigations prompted the U.S. Environmental Protection Agency ("EPA") to initiate further environmental testing of the water and soil at the properties and surrounding areas.    Finding evidence of toxic leakage, the EPA filed in 1983 the first of several lawsuits related to the pollution, ultimately joining Bloom, Curtis, the Paynes, Pepper's and FP&L as defendants, United States v. Pepper's Steel & Alloy, Inc., et al., Case No. 83-1717-CIV-EPS (S.D. Fla.) ("1983 Action").[2]  The 1983 Action sought injunctive relief to gain access to the Pepper's Steel site to undertake response and remedial actions.    FP&L later filed a third-party complaint joining Miami Battery in the lawsuit.[3]

---

[2]In 1983, a civil action was also filed by the State of Florida Department of Environmental Regulation ("Florida DER") against Pepper's Steel, FP&L, and the landowners in the Circuit Court of Dade County, Florida, State of Florida Department of Environmental Regulation v. Pepper's Steel & Alloy, Inc., et al., Case No. 83-24667-08 (Fla. Cir. Ct.) (hereafter "DER Action").  The Florida DER complaint alleged that the release of PCBs caused damage to the environment and resulted in response costs.  This case settled on March 1, 1991.

[3]Three "coverage" cases followed, whereby Payne, Pepper's and FP&L filed lawsuits against their respective insurance carriers to determine duties to defend and indemnify.  The coverage cases resulted either in judgments of coverage in favor of the landowner-insureds, or settled.
   The first of these cases was brought by Payne against United States Fidelity & Guaranty Co. ("USF&G") and Maryland Casualty Company, Payne v. United States Fidelity & Guaranty Co. et al., Case No. 84-1443-CW-EPS (S.D. Fla.) and resulted in partial summary judgment in Paynes' favor as to the duty to defend. The remaining claims were resolved by settlement.
   The second of these cases was filed in 1986 by Pepper's against USF&G, Transportation Insurance Company, Continental Casualty Company and Home Insurance Co., Pepper's Steel & Alloy, Inc. v. United States Fidelity & Guaranty Co., et al., Case No. 86-1531-CIV-EPS (S.D. Fla.), and was eventually consolidated with the EPA Action in 1996 and remains pending in another Division of this Court. See Payne v. United States Fidelity & Gur. Co., et al., 625 F. Supp. 1189, 1193 (S.D. Fla. 1985) (Spellman, J.).

Upon learning of additional pollution, the EPA filed in 1985 a separate, identically styled action, Case No. 85-0571-CIV-DAVIS (S.D. Fla.) ("1985 Action").  This case sought recovery of cleanup costs and other damages related to removal of contaminants from the Pepper's Steel site pursuant to section 107 of CERCLA.  The 1983 and 1985 cases were eventually consolidated, and the consolidated case remains pending before another Division of this Court.

In 1986 an action was brought by FP&L against the original manufacturers of the electrical transformers, Florida Power & Light Co. v. Allis-Chalmers Corp., et al., Case No. 86-1571-CIV-ATKINS (S.D. Fla.) (the "Transformer Case").  On April 15, 1987, Curtis and the Paynes' filed a complaint in intervention in the Transformer Case.  Curtis and Miami Battery were thereafter joined in counter/third-party claims filed by FP&L and the manufacturers. The Transformer Case was resolved by settlement in 1993.

---

On August 12, 1987, this Court entered partial summary judgment in favor of Pepper's and Bloom against USF&G and CNA, determining these carriers had breached duties to defend in the EPA and DER Actions.  See Pepper's Steel & Alloys, Inc. v. United States Fidelity & Guar. Co., et al., 668 F. Supp. 1541, 1550 (S.D. Fla. 1987) (Spellman, J.).

On June 7, 1993, this Court entered partial summary judgment in favor of Pepper's, Bloom and FP&L in the Pepper's and FP&L coverage cases, determining that the EPA Action encompassed a "claim for damages" as that term is used in insurance policies generally.  See United States v. Pepper's Steel & Alloys, Inc., et al., 823 F. Supp. 1574, 1577 (S.D. Fla. 1993) (Paine, J.).

On June 12, 1995 this Court entered an Omnibus Order granting partial summary judgment of liability in favor of FP&L against Home Insurance Co. and Certain Underwriters at Lloyds, on the issue of indemnity as to those insurance policies not containing a pollution exclusion.  See United States v. Pepper's Steel & Alloys, Inc., et al., Case No. 85-0571-CIV-PAINE (S.D. Fla. June 13, 1995) (Paine, J.).

## 1.  Insurance Policies

During relevant times in this lawsuit, from 1966 and intermittently through 1973, BOC issued and delivered the following Comprehensive General Liability ("CGL") insurance policies:

> A. Boston Insurance Company Policy No. GAC 720021, incepting July 15, 1966 with a stated expiration date of July 15, 1967 ("BOC I").
> B. A BOC policy with unknown policy number, incepting July 15, 1968 with a stated expiration date of July 15, 1969 ("BOC II")
> C. BOC Policy No. L-1-26-79-33, incepting July 15, 1969 with a stated expiration date of July 15, 1970 ("BOC III").
> D. BOC Policy No. L-1-50-51-21, incepting July 15, 1970 with a stated expiration date of July 15, 1971 ("BOC IV").
> E. BOC Policy No. L-6-31-39-05, incepting July 15, 1971 with a stated expiration date of July 15, 1972 ("BOC V").
> F. BOC Policy No. L-428-68-37, incepting July 15, 1972 with a stated expiration date of July 15, 1973 ("BOC VI").

(For copies of BOC IV-VI see Compl. Ex. A; for BOC I see Second Am. Compl. Ex. A; BOC II & BOC III have not been located, but secondary evidence reflecting their existence has been filed with the Court.) The Court limits consideration of summary judgment below to BOC IV-VI and reserves ruling on BOC I-III pending further discovery.

Plaintiffs also held certain general insurance policies issued by Continental Insurance Company, later known as "CNA." The division of CNA responsible for adjusting Plaintiffs' claims was

Underwriters Adjusting Company ("UAC"). Plaintiffs continue to take discovery on the CNA policies. The court does not make any ruling regarding these policies or specific claims against CNA in this Order, except as may relate to certain findings regarding BOC policies IV-VI.

### 2.  Notice to BOC of the EPA, DER and Transformer Cases

As Curtis and Miami Battery were brought into the 1983 EPA Action and the contemporaneous DER Action, Plaintiffs notified their insurance carriers on September 2, 1983 and requested payment for costs associated with the litigation. (See Compl. Ex. D; Wilcox Aff., Ex. 5; Mercer Aff., Ex. A.) Copies of the relevant polices along with other pertinent papers in the EPA and DER actions were subsequently provided to BOC on October 6, 1983. (See Wilcox Aff., Ex. 5.) Later, after the EPA filed the 1985 Action, Plaintiffs informed BOC of this development and requested BOC and the other carriers defend them and pay related costs. (Id.) In this vein, Counsel for Plaintiffs forwarded on May 28, 1985 a copy of the 1985 EPA complaint and related legal documents, along with copies of some of the relevant insurance policies issued by BOC. (Wilcox Aff., Ex. 13.)

When Plaintiffs first informed BOC of the 1983 Action, BOC did not respond or acknowledge receipt of any of these claims. (Wilcox Aff. ¶¶ 13-24.) During the week of October 6, 1983, after the

period for BOC to comply with certain Florida statutory provisions had expired, BOC contacted Counsel for Plaintiffs to ask for copies of the insurance policies.  (<u>Id.</u> at ¶¶ 13-14.)  From October 6, 1983 until April 6, 1984 – a period of seven months – BOC failed to correspond with Plaintiffs. (<u>See</u> <u>id.</u>, Ex. 6-11.)  Several requests were made by Plaintiffs for information and for their position regarding the duty to defend. (<u>Id.</u> ¶¶ 13-34.)  During a telephone call on June 12, 1984, Plaintiffs allege BOC provisionally agreed to defend Plaintiffs but declined to provide written confirmation of either its assumption of the defense or its agreement to pay costs.  (<u>See</u> Mercer Aff., Ex B.)  Plaintiffs allege BOC only provided tentative agreement on assumption of a defense in December, 1985, more than two years after the first notice of the claim. (<u>Id.</u> ¶ 34.)

### 3.   BOC's Failure to Respond and Intermittent Defense Payments in EPA and DER Actions

As demonstrated by the record of correspondence, affidavits and additional record evidence, BOC's willingness to pay defense costs related to the 1983 EPA Action was at best circumspect. Plaintiffs allege BOC was unwilling to pay for certain expert witnesses, paid bills only intermittently after long delays, and paid only a portion of purportedly covered costs.  For example, after receipt of bills for attorney's fees incurred for the period

10

July 1989 through December 1989, BOC requested on February 16, 1990
that the fees and costs incurred in the EPA and DER actions be
separated from those incurred in the Transformer Case. (See Wilcox
Aff., Ex. 14.)  Plaintiffs resubmitted the bills as requested and
thereafter submitted delineated bills. (See Wilcox Aff. Ex. 2-14.)
When no payment followed, Plaintiffs sent a series of letters to
BOC requesting some explanation between 1990 and 1992. (See Wilcox
Aff., Ex. 14.)  After December 1989, BOC apparently provided no
further payments of defense costs in connection with the EPA and
DER actions, with the lone exception of $19,425.77 in April 1992.
(See Second Am. Compl. ¶ 48.)

### 4.  The Transformer Case

In December 1986, Plaintiffs wrote to BOC and the other
insurance carriers recommending that a complaint of intervention be
filed in the Transformer Case prior to the court-imposed deadline
of February 1, 1987.  (See Mercer Aff. ¶¶ 30-31 & Ex. Q.)
Plaintiffs requested that BOC respond with any objections to
proceeding in the Transformer Case prior to that date.  (See id.)
When no objections were received, Curtis, Miami Battery and the
Paynes filed a complaint in intervention.  (See id.)  The
manufacturers then filed counterclaims against Curtis, Miami
Battery and the Paynes.  Copies of all relevant papers documenting
the litigation progress were periodically provided to BOC.

11

Thereafter, from April 15, 1987 through the billing period ending June, 1989, BOC, without objection, paid a portion of the legal fees and other costs incurred in connection with the prosecution of the Transformer Case and the defense of the counterclaims asserted therein. As described above, even though it had received prior notice of Plaintiffs' intent to intervene in the Transformer Case and had paid a portion of the legal fees associated with this intervention, in early 1990 BOC appears to have retreated from this position. (See Wilcox Aff. ¶¶ 58-60.) BOC wrote to demand that costs associated with the Transformer Case be separately billed from the EPA and DER actions. (Id. at ¶¶ 27-34 & 64.) Additionally, BOC asserted that it had not authorized Curtis' intervention into the Transformer Case. (Id.) While BOC paid costs associated with the Transformer Case from 1987 until 1989, BOC stated it would thereafter pay no additional costs related to the Transformer Case. (Id.)

In April, 1990 plaintiffs in the Transformer Case other than Curtis and Miami Battery suffered the entry of adverse summary judgment on their claims against the transformer manufacturers. Curtis and Miami Battery were left to shoulder the entire cost of prosecuting the Transformer Case and defend against the counterclaims. Because these various legal actions reduced Plaintiffs' liquidity, and because legal bills were no longer

12

covered by BOC, Curtis and Miami Battery allege they were forced to settle claims with the transformer companies under largely unfavorable circumstances. (See Second Am. Compl. ¶¶ 51-55.)   To date, Plaintiffs allege, BOC has not payed the outstanding fees and costs incurred through the date of settlement in the Transformer Case.

### 5.   BOC and CNA's Participation in and Involvement With Settlement Efforts--The 1987 FP&L-EPA Consent Decree

In December 1984, FP&L proposed a settlement to clean up the Pepper's Steel site.  As part of this settlement effort Counsel for Miami Battery and Curtis wrote to BOC's Coverage Counsel, Robert A. Mercer, on December 13, 1984 to request BOC's position on and participation in these settlement negotiations.  (See Mercer Aff. ¶¶ 11-12 & Ex. F.)  Plaintiffs allege BOC has yet to respond.

In January 1986, Plaintiffs attempted to obtain BOC's participation in a proposed settlement with the EPA.  Plaintiffs specifically requested BOC tender its policy limits and also requested participation from the other insurance carriers. (See Mercer Aff. ¶¶ 22-24 & Ex. K.)  As demonstrated by the record of correspondence, Plaintiffs had put Defendants on notice of the underlying claims and had alleged coverage existed under four BOC insurance policies and also under a fifth policy administered by BOC.  However, Plaintiffs allege BOC considered settlement only

13

under three of its policies and therefore failed to offer the actual limits. (See Second Am. Compl. ¶¶ 63-68.) Plaintiffs further allege American Home refused to participate in these settlement negotiations at all. (See id. ¶ 67.) Since American Home had refused to participate and BOC failed to consider or authorize payment on all available coverages under the Policies, Plaintiffs argue, they were unable to settle with the EPA at that time. Ten additional years of litigation followed.

In March 1987, Judge Paine entered the 1987 Consent Decree settling the EPA claims against FP&L, providing for the remediation of the Pepper's Steel Site by FP&L at a cost of approximately $18 million. Plaintiffs were not a party to this settlement and allege BOC's refusal to contribute an amount within its combined pre-occurrence coverage limits prevented Plaintiffs from receiving the protection of the 1987 Decree, including statutory contribution protection and a release and covenant not to sue.

Shortly after the 1987 Consent Decree in the EPA Action, the Court lifted a stay of proceedings that had been in effect and the remaining parties began active litigation. Numerous depositions, voluminous document exchange, assertion of multiple claims by various parties, and considerable motions practice followed with claims eventually reaching $30 million.

In December, 1988 Plaintiffs again requested BOC and the other

14

carriers provide settlement authority for settlement discussions with the EPA.  (See Mercer Aff., Ex. R.)  In January, 1989 American Home responded in writing asserting no coverage existed under its policies.  Also in response, Plaintiffs allege, BOC again refused to offer the true full limits of the policies.  Plaintiffs thereafter engaged in protracted negotiations with BOC over coverage terms and policy obligations but to no avail. (See, e.g., Mercer Aff., Ex. S.)

### 6.    Partial Summary Judgment Entered Against All Plaintiffs in EPA Action and Subsequent Consent Decree Judgment Against Curtis and Miami Battery in Transformer Case

On June 12, 1995 the Court entered Partial Summary Judgment of Liability in favor of the EPA and against Pepper's, Bloom and Thomas A. Curtis.  See United States v. Pepper's Steel and Alloys, Inc., et al., Case No. 85-0571-CIV-PAINE (S.D. Fla. June 12, 1995) (Omnibus Order on All Pending Motions).  Granting summary judgment in favor of the Government on the issue of CERCLA liability, Judge Paine found Curtis (and by implication Miami Battery) jointly and severally liable along with the other landowners, determining:

> Curtis has owned Tract 46 since 1958.  Curtis leased the premises to Pepper's which conducted a metal scrapping and salvaging business thereon from 1965-1975.  During this time, Pepper's stored electrical transformers on the property.  Accordingly, Thomas Curtis is liable to the government as an owner for response costs associated with clean up of the site under 42 U.S.C. § 9607(a)(1).

Id. at 18.   The 1995 partial summary judgment resulted in further settlement negotiations among the parties.

The case was later transferred to Judge Davis, and on October 16, 1997, after a settlement agreement was reached among the remaining parties, the Court entered a Consent Decree in the EPA Actions.   See United States v. Pepper's Steel and Alloys, Inc., et al., Case No. 85-0571-CV-DAVIS (S.D. Fla. Oct. 16, 1997) (Consent Decree).   The 1997 Consent Decree was entered in favor of the United States and enforced a settlement reached between USF&G, FP&L, Pepper's, Bloom, the Paynes, Thomas A. Curtis, and Miami Battery.   While BOC was invited to participate in and assist with the resolution of the EPA Action, it did not.   (See Mercer Aff. ¶¶ 33-39.)   After publication, the Consent Decree was entered as a Judgment of Consent Decree by this Court on October 16, 1997.[4]

Miami Battery and Curtis filed this lawsuit on October 24, 1997.  Having initiated this action against their various insurance carriers, and having partially settled with Sentry and American Home, Plaintiffs now seek to recover from BOC and CNA under various theories of liability.

---

[4]USF&G has paid the settlement amount together with post-judgment interest on behalf of its insureds.   Previously, in 1995, the parties to the EPA Action and the Pepper's coverage case settled with CNA.   See note 3, supra.

16

## B. Procedural History

The Amended Complaint, filed on December 23, 1997 alleged in Count I breach of the duty to defend against BOC and Sentry (Am. Compl. ¶¶ 104-108); in Count II breach of the duty to indemnify against BOC, Sentry and American Home (Am. Compl. ¶¶ 109-111); in Count III statutory bad faith against BOC (Am. Compl. ¶¶ 112-18); in Count IV breach of fiduciary duty against BOC and Sentry (Am. Compl. ¶¶ 119-123); in Count V statutory bad faith against Sentry (Am. Compl. ¶¶ 124-131); and in Count VI statutory bad faith against American Home (Am. Compl. ¶¶ 132-138). Plaintiffs sought declaratory relief and unspecified actual and punitive damages.

Sentry moved to dismiss Plaintiffs' claim for punitive damages on January 26, 1998, and BOC filed an identical motion on April 22, 1998.[5] On March 18, 1998 the Court dismissed without prejudice the claim for punitive damages against Sentry as alleged in Count VI of the Amended Complaint.[6] Sentry then filed on March 26, 1998 for severance and abatement of the bad faith claims.

On May 14, 1998 the Court dismissed without prejudice all

---

[5]Prior to ruling on this motion, Plaintiffs and American Home settled, and on February 27, 1998 the Court dismissed all claims against American Home with prejudice.

[6]Magistrate Judge Bandstra on March 28, 1998 entered a redundant Order dismissing Plaintiffs' Claim for punitive damages against Sentry in Count VI of the Amended Complaint. This ruling was consistent with the Court's March 18, 1998 Order, however, as Plaintiffs were granted leave to refile any claim for punitive damages upon sufficient factual proffer.

claims for punitive damages against BOC.  The May 14, 1998 Order also granted Sentry's motion to sever and abate.  However, the Court at footnote 2 stated "Plaintiffs raised solely first-party insurance claims against Defendants."  Plaintiffs moved for reconsideration of this statement on September 1, 1998, and this motion is currently ripe for adjudication.

Separately, Plaintiffs filed April 20, 1998 for partial summary judgment against Sentry and BOC concerning the duty to defend and various provisions of Florida insurance law, including the Florida Claims Administration Statute, Fla. Stat. § 627.426 (1995).[7]  As Sentry is no longer a party to the lawsuit, the motion is currently ripe for adjudication only as it pertains to BOC.

Plaintiffs filed on January 12, 1999 a Second Amended Complaint that alleged numerous Florida state law claims against one original Defendant, BOC, and based on information gathered during discovery, against Continental Casualty Company as successor-in-interest to Continental Insurance Company.[8]  The

---

[7]On October 26, 1998 Plaintiffs and Sentry gave notice of settlement.  The Court's Order of Dismissal on January 12, 1999 mooted all claims against Sentry, as well as Sentry's cross-motion for summary judgment, filed June 3, 1998.

[8]Plaintiffs filed on January 12, 1999 a motion for leave to file a second amended complaint.  The motion to amend had not been ruled upon when, on February 16, 1999 Plaintiffs filed a proposed "Substituted Second Amended Complaint," also entitled "Second Amended Complaint," requesting the Court consider this substituted document when ruling upon the January 12, 1999 motion.  The February 16, 1999 motion to consider the substituted document was granted March 30, 1999,

Second Amended Complaint seeks in Count I declaratory relief against BOC (Second Am. Compl. ¶¶ 87-92); and alleges breach of the duty to defend as to BOC in Count II (Second Am. Compl. ¶¶ 93-97); breach of the duty to indemnify against BOC in Count III (Second Am. Compl. ¶¶ 98-100); breach of fiduciary duty against BOC and CNA in Count V (Second Am. Compl. ¶¶ 101-104); and fraud against BOC and CNA in Count VI (Second Am. Compl. ¶¶ 105-109).[9]

Attempting to address the Plaintiffs' September 1, 1998 motion for Reconsideration, the Court on February 10, 1999 issued an Order to Vacate the Court's Order of May 14, 1998. (See Order Vacating Prior Order Dated May 14, 1998, filed Feb. 10, 1999) (hereafter "February 10, 1999 Order to Vacate"). Recognizing the Court's earlier assertion on May 14, 1998 characterizing this action as a

---

and the Court therefore construes the substituted document as the Second Amended Complaint.

  While the Magistrate Judge assigned to this case had been Magistrate Judge Ted E. Bandstra, on April 1, 1999, the case was reassigned to Magistrate Judge William C. Turnoff pursuant to Southern District of Florida Administrate Order 99-27, filed April 1, 1999 (In Re: Implementation of Magistrate Judge Pairing Assignment Plan in Miami).  However, Magistrate Judge Bandstra entered an "Order Granting Motion to Amend Amended Complaint," on April 7, 1999.  Because this order was entered after the enactment of the Southern District of Florida Magistrate Judge Reassignment Plan, BOC filed on April 9, 1999 an unopposed motion to vacate the April 7, 1999 order.  The Court granted the April 9, 1999 motion to vacate on April 14, 1999.  Thus, the January 12, 1999 motion for leave to amend remains ripe for adjudication.

  The Court has considered the motion for leave to amend, the response and the record in this case and shall grant the January 12, 1999 motion nunc pro tunc, to the date of the filing of the substituted Second Amended Complaint, February 16, 1999.

[9]The Second Amended Complaint reserved Count IV for future assertion of a statutory bad faith claim against BOC and CNA.

first-party action could be incorrect, the Court stated "Plaintiffs' case involves a third-party bad faith claim." (<u>Id.</u> at 2.). However, the Court went on to state that such a claim is not subject to the procedural requirements of <u>Blanchard v. State Farm Mut. Auto. Ins. Co.</u>, 575 So. 2d 1289, 1291 (Fla. 1991). As will be discussed below, this finding was erroneous. <u>See, e.g.</u>, <u>Doan v. John Hancock Mut. Life Ins. Co.</u>, 727 So. 2d 400 (Fla. 3d Dist. Ct. App. 1999) (en banc) ("The suggestion that the [Florida] Supreme Court's decision in <u>Blanchard</u> is limited to uninsured motorist claims is not supported by a close reading of that opinion.")

On March 24, 1999 the Court granted summary judgment for Plaintiffs against BOC, finding BOC had a duty to defend Plaintiffs, that BOC breached this duty, and that BOC violated the Florida Claims Administration Statute. (Order Granting Plaintiffs' Motion for Partial Summary Judgment, Denying Motion for Oral Argument, and Granting Motion for Leave to File, filed March 24, 1999) (hereafter "March 24, 1999 Order of Partial Summary Judgment").

Concerned that the February 10, 1999 Order may have misapplied Florida law, and that the Court's March 24, 1999 grant of summary judgment could be construed as based, in part, on an erroneous legal interpretation, the Court vacated the February 10, 1999 Order to Vacate and the March 24, 1999 Order of Partial Summary Judgment,

on April 14, 1999.[10]

Therefore, currently ripe for disposition are Plaintiffs'
motion for reconsideration of the May 14, 1998 Order, filed
September 1, 1999; Plaintiffs' motion for partial summary judgment
against BOC, filed April 20, 1998; and various related motions
seeking to extend scheduling requirements.


## II.  Standard of Review

On a motion for summary judgment, the court is to construe the
evidence and factual inferences arising therefrom in the light most
favorable to the nonmoving party.  <u>Adickes v. S.H. Kress & Co.</u>, 398
U.S. 144, 157 (1970).  Summary judgment can be entered on a claim
only if it is shown "that there is no genuine issue as to any
material fact and that the moving party is entitled to judgment as
a matter of law."  Fed. R. Civ. P. 56(c).  The Supreme Court
explained the summary judgment standard as follows:

> [T]he plain language of Rule 56(c) mandates
> the entry of summary judgment, after adequate
> time for discovery and upon motion, against a
> party who fails to make a showing sufficient
> to establish the existence of an element

---

[10]Based on the Orders of February 10, 1999 and March 24, 1999, the parties
were in the process of taking certain discovery when the April 14, 1999 Order to
Vacate issued.  Understandably, the April 14, 1999 Order caused some confusion
among the parties and further complicated the taking of discovery.  (<u>See</u> Cutis'
Emergency Motion for Status Conference, filed April 20, 1999.)  The Court
recognizes the complications engendered by these Orders and seeks to resolve each
issue in turn.

> essential to that party's case, and on which
> that party will bear the burden of proof at
> trial. In such a situation, there can be no
> genuine issue as to any material fact, since a
> complete failure of proof concerning an
> essential element of the non-moving party's
> case necessarily renders all other facts
> immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The trial

court's function at this juncture is not "to weigh the evidence and

determine the truth of the matter but to determine whether there is

a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 249-50 (1986) (citations omitted). The party asking for

summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion, and

identifying those portions of the 'pleadings, depositions, answers

to interrogatories, and admissions of file, together with

affidavits, if any,' which it believes demonstrate the absence of

a genuine issue of material fact." Celotex, 477 U.S. at 323. Once

this initial demonstration under Rule 56(c) is made, the burden of

production, not persuasion, shifts to the nonmoving party. The

nonmoving party must "go beyond the pleadings and by [his] own

affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there

is a genuine issue for trial.'" Celotex, 477 U.S. at 324; see also

Fed. R. Civ. P. 56(e).  In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine issue for trial." Matsushita, 475 U.S. at 587.  An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita, 475 U.S. at 587; see also Anderson, 477 U.S. at 249.

## III.  Analysis

The Court first clarifies and amends the May 14, 1998 Order, determining this action to be characteristic of a third-party insurance claim under Florida law.  Next, the Court explains the erroneous legal statement in the February 10, 1999 Order.  Finding the procedural requirements for stating a Florida failure to defend claim have been met by Plaintiffs here, the Court turns to Plaintiffs' Motion for Partial Summary Judgment.

The Court next determines BOC had a duty to defend under three policies examined, and reserves on the remaining BOC policies.  The Court finds that BOC breached its duty to defend the EPA and DER Actions, and to contribute to the defense in the Transformer Case.

23

The Court reserves further analysis of certain BOC policies, issues
related to CNA, and other damages claims.   Finally, the Court
grants certain procedural motions, provides Plaintiffs leave to
file any amended complaint, and reopens the discovery period.

### A.   The Court's May 14, 1998 Order

At footnote 2 of its May 14, 1998 Order, the Court stated:

> Plaintiffs submit that their bad faith failure
> to  settle  action  is  not  subject  to  the
> prerequisite  articulated  in  the  Blanchard
> court,  because  Blanchard  involved  a  first-
> party  suit,  unlike  the  instant  case  which
> involves a third party suit.   The Court will
> not  pass  upon  whether  Blanchard's  holding
> applies to third-party actions for failure to
> settle, but it will note that Plaintiffs are
> mistaken in their belief that this suit is
> such an action.   In a third-party failure to
> settle  action,  suit  is  brought  by  an
> individual against an insurance company which
> has   underwritten   the   policy   of   another
> individual who caused him injury.   Such is not
> the case before this Court.   In the instant
> action, individuals, Plaintiffs, have filed a
> failure  to  settle  claim  against  their  own
> insurance compan[ies].   Such is a first-party
> action.

(Order Granting Motion to Sever and Abate, filed May 14, 1998, at
4 n.2.)   The May 14, 1998 Order granted Sentry's motion to sever
and abate, and further granted Sentry's motion to dismiss claims
for punitive damages without prejudice.   In making the "first-

party" determination, the Court limited its examination to the party filing the lawsuit in this case, rather than the nature of the insurance relationship, the duties owed, and the entity ultimately receiving the benefits of the insurance policy. For the reasons that follow, the Court finds the statements made in footnote 2 of the May 14, 1998 Order to be incorrect and amends the Order accordingly.

The Florida Supreme Court in State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So. 2d 55 (Fla. 1995) provided thorough analysis of the fiduciary relationship between insurance companies and insureds. Under liability policies such as those issued by BOC in this case, "insurance companies [take] on the obligation of defending the insured, which, in turn, [makes] insureds dependent on the acts of the insurers; insurers [have] the power to settle and foreclose an insured's exposure or to refuse to settle and leave the insured exposed to liability in excess of policy limits." Id. at 58 (citing Roger C. Henderson, The Tort of Bad Faith in First-Party Insurance Transactions: Refining the Standard of Culpability and Reformulating the Remedies by Statute, 26 U. Mich. J. L. Ref. 1, 19-22 (1992)). Therefore, the insurance company is in a fiduciary relationship with the insured "similar to that which exists between an attorney and client." Laforet, 658 So. 2d at 57

(citation omitted).  Under such a relationship, the insurance company owes a duty to refrain from acting solely in the insurance company's own interests--to "exercise good faith" and undertake "the avoidance of bad faith."  See id. (citing Henderson, 26 U. Mich. J. L. Ref. at 22).

As the Laforet court explained, under this standard of liability,

> "[I]f an insurer was found to have acted in bad faith, the insurer would have to pay the entire judgment entered against the insured in favor of the injured third party, including any amount in excess of the insured's policy limits.  This type of claim became known as a third-party bad faith action."

Id.  Moreover, "[u]nlike third-party bad faith actions, in first-party bad faith actions the insured [is] also the injured party who is to receive the benefits under the policy."  Id. at 59 (citing McLeod v. Continental Ins. Co., 591 So. 2d 621 (Fla. 1992), holding superceded by statute as stated in Time Ins. Co. v. Burger, 712 So. 2d 389, 392 (Fla. 1998) (stating Fla Stat. § 627.727(10) overturned the holding of McLeod by authorizing the recovery of the "excess judgment" in first-party bad faith actions against uninsured motorist insurance carriers)).

The court in McLeod further clarified the differences between first-party and third-party actions, noting that

26

> [t]he first party action is one in which the insured is also the injured party who is to receive the benefits under the policy. In contrast, a third party action is one in which a third party injured, not the insured, is entitled to the benefits under the policy as the result of the insured's tortuous conduct.

McLeod, 591 So. 2d at 623 n.3. The shortfall between all available insurance coverage and the amount an insured must pay to a third party is referred to as the "excess judgment." See id. at 623. In a bad faith action, the damages recoverable are those proximately caused by the insurer's bad faith.[11] See id.

The proper characterization of this case has important consequences for discovery. As the court held in Dunn v. National Sec. Fire and Cas. Co., 631 So. 2d 1103, 1109 (Fla. 5th Dist. Ct. App. 1993):

> In bad faith suits against insurance companies for failure to settle within the policy limits, all materials in the insurance company's claimed failure up to the date of the judgment in the underlying suit are obtainable, and should be produced when sought

---

[11] In McLeod, the court held the plaintiff stated a first-party claim, and went on to hold the plaintiff could therefore not recover the "excess judgment" because "even though the amount of that judgment represented damages sustained by him, it was the tort-feasor rather than the insurance company that caused those damages." 491 So. 2d 621, 626. Therefore, the characterization as "first-party" was outcome determinative.

However, in 1997 the Florida Legislature enacted section 627.727(10). Section 627.727(10) specifically overturned the McLeod holding, as later explained by the Florida Supreme Court in Time, and "authoriz[ed] recovery of the 'excess judgment' in first-party bad faith actions against uninsured motorist carriers." Time, 712 So. 2d at 392. As will be discussed infra, this principle extends beyond automobile actions to other forms of insurance.

27

> by discovery.  Additional memos or documents
> in the file <u>after</u> date of the judgment can be
> obtained with a showing of good cause.

<u>Id.</u> at 1109. (citations omitted).  <u>See also</u> <u>Continental Cas. Co. v.</u>

<u>Aqua Jet Filter Sys. Inc.</u>, 620 So. 2d 1141, 1142 (Fla. 3d Dist. Ct.

App. 1993).

As determined by the <u>Lafore</u>, <u>McLeod</u>, and <u>Time</u> courts, it is

the nature of the claim and the relationship between the insured

and the injured party that determines whether it is first or third-

party in nature.  The Court finds that Plaintiffs here seek to

recover costs of litigation of various lawsuits for pollution on

property Plaintiffs' owned and environmental damage that resulted.

They also seek or plan to seek recovery of any excess judgment that

may have been proximately caused by the Insurance Companies'

breach.  Plaintiffs therefore seek costs reasonably foreseeable and

proximately caused by the denial of benefits under the policy.  As

a Consent Decree has been entered by this Court determining

Plaintiffs owe money damages because of the pollution, and as the

Court makes a determination of coverage <u>infra</u>, Plaintiffs are able

to state such a claim.  Under the facts as alleged here, the Court

finds Plaintiffs state a third-party insurance action against the

Defendant Insurance Companies under Florida statutory and common

law.  As such, the Court sets aside footnote 2 of the May 14, 1998

28

Order and all language characterizing this case as a first-party insurance action, finding this characterization to be contradicted by the record.   The May 14, 1998 Order shall be amended accordingly.

### B.   The February 10, 1999 and March 24, 1999 Orders

The Court's February 10, 1999 Order contained an erroneous interpretation of Florida law.  First, properly characterizing one of Plaintiffs' claims as a third-party bad faith claim, the Court then improperly stated that as such, it "is not subject to the Blanchard rule," (Order Vacating Prior Order Dated May 14, 1998, filed February 10, 1999, at 2) or the requirement that an "insured's underlying first-party action for insurance benefits against the insurer must be resolved favorably to the insured before a cause of action for bad faith . . . can accrue."  (Id. quoting Blanchard v. State Farm Mut. Auto. Co., 575 So. 2d 1289, 1291 (Fla. 1991)).  The Court's further statement that, "The Blanchard rule does not apply to third-party bad faith claims," (Order of February 10, 1999, at 2) was incorrect and will be discussed below.

The Court on April 14, 1999 vacated the February 10, 1999 and March 24, 1999 Orders.  The Court now reexamines this area of the

law as it applies to the facts of this case.

### 1.   Bad Faith and Breach of Fiduciary Duty

As the Florida Fourth District Court of Appeal stated in
Brookins v. Goodson, 640 So. 2d 110 (Fla. 4th Dist. Ct. App. 1994),
"third-party common law bad faith consists of conduct by a
liability insurer which exposes its insured to an excess judgment
when the insurer could have and should have settled the claim
against its insured within the policy limits." 640 So. 2d at 113.
First-party actions, on the other hand, "consist of the insurer's
wrongful refusal to settle a claim accruing directly to its own
insured[.]" Id.; see also Cunningham v. Standard Guar. Ins. Co.,
630 So. 2d 179, 181 (1994) (stating that "the essence of a third-
party bad-faith cause of action is to remedy a situation in which
an insured is exposed to an excess judgment because of the
insurer's failure to properly or promptly defend the claim.")
(citing Fidelity & Casualty Co. v. Cope, 462 So. 2d 459, 460 (Fla.
1985)).

As explained above, the Florida Supreme Court in McLeod
explained that a "first party action is one in which the insured is
also the injured party who is to receive the benefits under the
policy.  In contrast, a third party action is one in which a third
party injured, not the insured, is entitled to the benefits under

30

the policy as the result of the insured's tortious conduct." Thus, this action is properly characterized as a third party action because the insured can be injured by any excess judgment. <u>See</u> <u>Brookings</u>, 640 So. 2d at 113; <u>Time</u>, 712 So. 2d at 391.

In <u>Cunningham</u>, 630 So. 2d 179 (Fla. 1994), the court citing to <u>Blanchard</u> held that

> [u]nder ordinary circumstances, a third party must obtain a judgment against the insured in excess of the policy limits before prosecuting a bad-faith claim against the insured's liability carrier. <u>See</u> <u>Blanchard v. State Farm Mut. Auto. Ins. Co.</u>, 575 So. 2d 1289 (Fla. 1991) (announcing analogous rule to that of a first-party bad-faith claim). However, even if a complaint were filed asserting a bad-faith claim against a liability insurance company without alleging the existence of a judgment against the insured in excess of the policy limits, the most that could be said would be that the complaint failed to state a cause of action. While the complaint in the instant case did not allege an excess judgment, the stipulation between the parties dispensed with the necessity of that requirement. <u>The stipulation was the functional equivalent of an excess judgment</u> for purposes of satisfying the principle of <u>Cope</u>. [462 So. 2d at 460]

<u>Cunningham</u>, 630 So. 2d at 181-82 (emphasis added).

In <u>Cunningham</u>, then, the existence of an underlying judgment of coverage by stipulation allowed the plaintiff to properly state a bad faith claim. The <u>Blanchard</u> ruling remains the law of

Florida: The contractual coverage dispute must be determined before a party may state a bad faith claim against an insurer.

Courts have construed <u>Blanchard</u>'s holding broadly. <u>See, e.g.</u>, <u>Fishkin v. Guardian Life Ins. Co. of America</u>, 22 F. Supp.2d 1365 (S.D. Fla. 1998) (Graham, J.). For example, in <u>Doan</u>, 727 So. 2d at 402-03, the <u>en banc</u> Florida Third District Court of Appeal disagreed with "[t]he suggestion that [<u>Blanchard</u>] is limited to uninsured motorist claims," as "not supported by a close reading of [the] opinion." <u>Id.</u> at 402; <u>see also</u> <u>Imhof v. Nationwide Mut. Ins. Co.</u>, 643 So. 2d 617, 619 (Fla. 1994).

Because Plaintiffs have stated a third-party insurance claim against the Defendants, the Court finds, based upon the finding that BOC breached its duty to defend as discussed <u>infra</u>, and the 1997 Consent Decree discussed above, that Plaintiffs are entitled to discovery matter as set out in <u>Dunn</u>, 631 So. 2d at 1109, pertaining to the remaining claims in the Second Amended Complaint. Plaintiffs' motion for reconsideration, filed September 1, 1998 is granted consistent with the above analysis, and leave is granted to amend the complaint in a manner consistent with this Order.

## C.  Plaintiffs' Motion for Partial Summary Judgment Against BOC

Plaintiffs filed for summary judgment on April 20, 1998 on the

issue of whether BOC and Sentry breached the duty to defend under the insurance policies.  As all claims against Sentry have now been dismissed, the Court now addresses the issue of whether any genuine issue of material fact remains on the question of whether BOC breached the duty to defend.  The Court determines that no such issue remains, and thus finds for Plaintiffs on the issue of breach of the duty to defend against BOC.

### 1.  Duty of Defense Under BOC Polices IV-VI

In Florida, an insurer's duty to defend against liability under an insurance policy is broad.  See Baron Iil Co. v. Nationwide Mut. Fire Ins. Co., 470 So. 2d 813-14, (Fla. 4th Dist. Ct. App. 1985).  Plaintiffs argue that the EPA action and the DER action triggered Defendant BOC's duty to defend under all five BOC policies at issue.  Conceding that "[a]s to the first two BOC policy years . . . [BOC] ultimately had a duty of defense on the DER and EPA Actions," (Def.'s Resp. Mot. Summ. J. at 17) BOC argues that for the 1972-73 policy year, a pollution exclusion clause negates both its duty to indemnify and its duty to defend. Following the argument in Plaintiffs' motion, however, the Court limits its analysis to BOC Policies "IV," "V" & "VI" for the policy years July, 1970 to July, 1973.  The Court reserves ruling on the remaining policies.

33

The <u>Baron</u> court explained the duty to defend encompasses legal actions against an insured that may state more than one theory of liability, and where the insurance policy may only cover one of the claims stated in such suit:

> [The duty to defend is] distinct from and broader than the duty to indemnify the insured against damages assessed, and if the complaint alleges facts showing two or more grounds for liability, one being within the insurance coverage and the other not, the insurer is obligated to defend the entire suit.

<u>Baron</u>, 470 So. 2d at 813-14.  Because insurance contracts are contracts of adhesion, Florida courts have held ambiguous language must be resolved in favor of an insured.  <u>See, e.g.</u>, <u>Florida Ins. Guar. Assoc. V. Giordano</u>, 485 So. 2d 453, 456 (Fla. 3d Dist. Ct. App. 1986); <u>Tropical Park, Inc. v. United States Fidelity & Guar. Co.</u>, 357 So. 2d 253, 256 (Fla. 3d Dist. Ct. App. 1978).

Interpreting Florida law, the Eleventh Circuit explained in <u>Lawyers Title Ins. Corp. v. JDC (America) Corp.</u>, 52 F.3d 1575 (11th Cir. 1995) that,

> [t]he duty to defend depends solely on the facts and legal theories alleged in the pleadings and claims against the insured.  The duty arises when the relevant pleadings allege facts that fairly and potentially bring the suit within policy coverage. . . .  Thus, the duty to defend is broader than the duty to indemnify in the sense that the insurer must defend even if facts alleged are actually

34

> untrue or legal theories unsound. If an
> examination of the allegations of the
> complaint leaves any doubt regarding the
> insurer's duty to defend, the issue is
> resolved in favor of the insured.

Id. at 1580-81 (internal quotation marks and citations omitted).
On the other hand, if the alleged facts and legal theories do not
fall within a policy's coverage, no duty to defend arises. See,
e.g., National Union Fire Ins. v. Lenox Liquors, Inc., 358 So. 2d
533, 538 (Fla. 1977) (holding that allegations of intentional acts
causing injury resulted in the complaint falling outside the
coverage of an insurance policy insuring only against accidental
injury); Scheer v. State Farm Fire & Cas. Co., 708 So. 2d 312, 313
(Fla. 4th Dist. Ct. App. 1998) (Same). The court in Chicago Title
Ins. Co. v. CV Reit, Inc., 588 So. 2d 1075 (Fla. 4th Dist. Ct. App.
1991), for example, held that the insurer had no duty to defend the
insured because "the allegations of the initial complaint did not
allege facts which would bring the case within the coverage of the
[insurance] policy." Id. at 1075-76.

   a)   The Coverage Provisions Here are Unambiguous

BOC policies "IV," "V" & "VI" each state:

> The Company will pay on behalf of the insured
> all sums which the insured shall become
> legally obligated to pay as damages because of
> . . . property damage . . . to which this
> insurance applies, caused by an occurrence,

> and the Company shall have the right and duty
> to defend any suit against the insured seeking
> damages on account of such bodily injury or
> property damage, even if any of the
> allegations of the suit are groundless, false
> or fraudulent, and may make such investigation
> and settlement of any claim or suit as it
> deems expedient . . . .

(See Curtis Aff., Ex. A.)

The policy preamble, identical to each policy, defines "property damage" as "injury to or destruction of tangible property." (Id.) The preamble further defines "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (Id.)

The Court finds the complaints in the EPA and DER actions, as well as the counterclaim/crossclaims in the Transformer Case contain allegations of "facts and legal theories" that "fairly and potentially" brought these two actions within policy coverage as gleaned from a fair reading of the policies. See, e.g., Scheer, 708 So. 2d at 313 (instructing trial court to "look to allegations in the complaint to determine whether [insurer] had duty to defend"); Giordano, 485 So. 2d at 456 (stating that "question of who eventually was going to pay the insured was extrinsic to the

36

question of who had a duty to defend the insured").

Moreover, the allegations against Curtis and Miami Battery in each lawsuit are equally devoid of alleged intentional or malicious conduct. The 1983 EPA Action, for example, alleges that Pepper's drained large quantities of contaminated oil and that "the other defendants [including Curtis] permitted this activity." (1983 EPA Compl. ¶ 11.) The 1985 EPA Action alleges, in slightly more detail, that co-defendant Pepper's "[i]n opening the transformers and haphazardly discarding the unsalvageable parts, the PCB laden oil was spilled and otherwise discharged." (1985 EPA Compl. ¶ 8.) The other defendants, including Curtis, "allowed [Pepper's] by lease or otherwise to use the properties owned by these defendants in [Pepper's] scrap metal and transformer salvage business." (Id. ¶ 6.) FP&L's amended cross-claim against Curtis (in the DER Action) alleges that Curtis, as a landowner:

> permitted Pepper's for years to operate its transformer salvage operations on portions of the Site . . . and failed to inquire into, investigate, or prevent the release or deposit of hazardous waste materials by Pepper's onto the Site, and [as an owner and operator of Miami Battery] released or deposited, or arranged for or permitted the release, deposit or disposal of hazardous substances by Miami Battery onto the Site.

(DER Compl. ¶ 22.)

37

The Court finds that such language -- e.g., "permitted" and "allowed" -- does not amount to intentional conduct.  Since "if the allegations of the complaint leave any doubts regarding the duty to defend, the question must be resolved in favor of the insured requiring the insurer to defend," <u>Giordano</u>, 485 So. 2d at 456 (citing <u>Baron</u>, 470 So. 2d at 814)), the Court concludes that these allegations are sufficient to "fairly and potentially" bring the complaints within policy coverage for "accident[s] neither expected nor intended from the standpoint of the insured," and that BOC owed Plaintiffs a defense.  As such, the Court finds BOC was legally obligated to defend Curtis and Miami Battery, under each of the BOC policies at issue for the EPA Actions, the DER Action, and the counterclaims/crossclaims in the Transformer Case.

### b)   The BOC Insurance Policies Contain No Valid Pollution Exclusion

BOC argues the pollution exclusion clause in the 1972-73 Policy abrogates its duty to defend under that policy.  The 1972-73 policy states the exclusion endorsement "shall not be binding upon the company unless countersigned by a duly authorized representative of the company."   The endorsement is not countersigned.   The Court has examined the policy and finds that without an applicable pollution exclusion, coverage existed under

the policies, and BOC owed Plaintiffs a defense.  <u>See</u> <u>Navy Mut.</u>
<u>Aid. Assoc. v. Barrs</u>, 23 Fla. L. Weekly D2565, 1998 WL 796306, at
*3 (Fla. 1st Dist. Ct. App. Nov. 17, 1998) (citing <u>Inter-Ocean Cas.</u>
<u>Co. v. Hunt</u>, 189 So. 240, 242 (1939) ("'It is a well recognized
rule of construction and interpretation of contracts for insurance
that the contract or policy must be liberally construed in favor of
the insured so as not to defeat, without plain necessity, his claim
to the indemnity which, in making the contract of insurance, it was
his purpose and intention to obtain[.]  Where two interpretations
equally fair may be given, that which gives the greater indemnity
will prevail.'" (citations omitted)).

### 2.  By its Conduct, BOC Breached its Duty to Defend

BOC contends that it attempted to meet its obligations to
defend Plaintiffs against the EPA and DER actions, but that
Plaintiffs were unreasonable in their demands and the other
insurance companies involved were unwilling to shoulder their share
of the defense burden.  Because of this, BOC claims it met its
obligations under the policies.

The record here demonstrates otherwise.  Although BOC cites to
the costs of the Transformer case and certain legal costs it
associates with unrelated Curtis matters to argue it bore its fair
share of the legal costs related to the policies, based on review

39

of the record evidence, the Court finds to the contrary.

From the period after it was informed by letter dated September 2, 1983, the record here, as recounted throughout this Order, demonstrates BOC breached its duty to defend through avoidance of its obligations; inconsistent or partial payments; and failure to acknowledge its obligations under the policies to defend the 1983 EPA, 1985 EPA, DER and Transformer Case litigations. (See, e.g., Mercer Aff. ¶¶ 3-39 & Ex. A-T; Wilcox Aff. ¶¶ 13-60, 64 & Ex. 5-33.)

As documented in the record of correspondence, carefully logged legal billing delineated by hours and billed at a "reduced" rate, and affidavits and depositions of the participants, the Court finds BOC breached its duty to defend Plaintiffs.

3.   **BOC Jointly and Severally Liable Under _Continental_ and _Argonaut_**

In _Argonaut Ins. Co. v. Maryland Cas. Co._, 372 So. 2d 960 (Fla. 3d Dist. Ct. App. 1979) one insurer sought to recover a pro-rata share of attorneys' fees incurred in providing a defense to the companies' mutual insured in a prior lawsuit.  As later explained by the court in _Continental Cas. Co. v. United Pacific Ins. Co._, 367 So. 2d 270, 271 (Fla. 5th Dist. Ct. App. 1994), the _Argonaut_ holding means that "the duty of each insurer to defend its

40

insured is personal and does not inure to the benefit of another insurer." Id. (citing Argonaut, 372 So. 2d at 961). The Continental court described a variety of methods by which mutual insurers may jointly satisfy their shared duty to defend:

> [Generally,] Florida insurers [will] meet their contractual duty to provide a defense in multiple coverage cases, even without the threat of contribution. As a practical matter, this happens in a variety of ways, depending on the circumstances. Sometimes carriers will agree to select an attorney who is on the "approved" list for each carrier and will split defense costs. Sometimes both carriers will hire counsel and provide legal representation, but with the understanding that the attorney hired by the carrier with the highest exposure will be lead counsel, assisted by the other. Sometimes, the defense functions are simply divided to save expenses and duplication of effort.

Id. at 273.

Therefore, in Florida, there is no right among insurance companies to seek subrogation or contribution for costs and attorney's fees. See Continental, 637 So. 2d at 272-275 (stating that "complications arising from the [possible] creation of [any] right of equitable contribution or equitable subrogation are at least as troublesome as the speculative ill sought to be remedied . . . [therefore,] the place for this issue to be examined and remedied, if appropriate, is in the legislature.") (citation

41

omitted).   The <u>Continental</u> court concluded,

> [We remind] any Florida insurer tempted
> to breach its duty to defend because Florida
> courts do not recognize a right of
> contribution between insurers for defense
> costs that the linchpin of Florida's rule is
> the certainty of our courts that all necessary
> remedies [for breach of the duty to defend]
> and protection to the <u>proper parties</u> are
> available.  We remain confident that, if it
> becomes necessary, the remedy found will not
> only adequately compensate the insured for the
> loss of the benefit of its bargain but will
> also meet the public policy goal of
> discouraging insurer misconduct."

<u>Id.</u> at 275-76 (internal citation omitted) (emphasis in original).

BOC has continually asserted, both in its dealing with its

insureds and in its pleadings before this Court, that it is only

obligated to pay a pro rata share of Plaintiffs' defense costs.

Defendant asserts an "early recognition by all persons involved"

was that "only Curtis' portion of the bill would be submitted for

payment to Curtis' insurers [and that] BOC would only be charged a

portion of the Curtis defense costs." (Def.'s Resp. Mot. Summ. J.

¶ 14.)   Defendant further states, "On or about late February or

early March, 1985, [BOC's counsel] advised [Plaintiffs' defense

counsel for the EPA/DER suits] of BOC's proposal of what they

believed to be a fair proration of their contribution for Curtis'

attorneys' fees." (Def.'s Resp. Mot. Summ. J. ¶ 22.)   An April 2,

42

1985 letter, from BOC to Plaintiffs' counsel, "reiterated BOC's position regarding pro rata payment of Curtis' defense costs. Based on BOC's interpretation of the costs sharing agreement . . . BOC agreed to pay Curtis' attorney's fee bill . . . in the amount of $4,605.56." (See Mercer Aff., Ex. M.)  BOC also offered to pay Curtis' expert bill according to the same pro rated percentage." (Id.)  BOC admits that "[s]ubsequent to 1991, BOC continued to attempt to ascertain the true defense costs and pay the appropriate pro rated cost of Curtis' defense." (Def.'s Resp. Mot. Summ. J. ¶ 50.)

On February 2, 1993, John Peach of BOC's Environmental Claims department wrote to Plaintiffs' counsel regarding BOC's continued unwillingness to pay the "share of defense costs that are attributable" to other insurers, and that it would "not accept the responsibility for any obligation of the other insurers, or the unauthorized legal work undertaken by you." (See Letter to John Wilcox from John B. Peach of Feb. 2, 1993, Wilcox Aff. Ex. 14.)[12]

---

[12]The Court finds that BOC was on notice of the applicable Florida case law as early as July 11, 1985.  In a detailed letter, BOC's attorney explained the applicable state of the law to BOC adjusters and outlined BOC's alternatives. From this letter it is clear that repudiation of the insureds' defense costs was not a legally valid option:

> I am enclosing a copy of the Argonaut Insurance Company case cited by Mr. Wilcox.  I have shepardized the Argonaut case and it is still good law in Florida. Thus, unless Boston Old Colony can enter into a

Because Florida insurance carriers who breach the duty to
defend are jointly and severally liable for all defense costs
incurred on behalf of its insured party, BOC is so liable here.
Based on the record evidence in this case, the Court further finds
that BOC affirmatively chose to ignore the legally sound advice of

---

contractual agreement with the other insurers for Miami
Battery and Mr. Tom Curtis, any monies that they pay in
attorney's fees and costs to defend these insureds, will
not be recoverable from any other insurer in a
subrogation action against them. Thus, Mr. Wilcox
[plaintiffs' attorney] is in a position to demand that
both Boston Old Colony and Middlesex Insurance Company,
be responsible for the full amount of the attorney's
fees incurred by Miami Battery and Mr. Curtis. The
choice is his. Furthermore, those insurers who have
denied coverage need only concern themselves with
attorney's fees in defending the declaratory action
against them. In the event Mr. Wilcox should prevail on
the coverage issue, then those insurers would only be
liable for their pro rata share of the limits of
liability in this matter.
    Thus, you can see from the foregoing, that Boston
Old Colony is in a "Catch-22" position. As I see it,
they have possibly three alternatives to pursue. The
first is that they can deny coverage and immediately
expect to defend the declaratory action with what I
believe to be an ultimate finding of coverage.
    Secondly, they can attempt to further negotiate
the attorney's fees position with Mr. Wilcox and Boston
Old Colony's insureds. Finally, Boston Old Colony can
attempt to negotiate a separate contractual agreement
with the other insurance companies to be responsible for
some predetermined pro ration of the attorney's fees and
costs incurred by Miami Battery and Mr. Curtis.
    I think the first alternatives would be an
exercise in futility. It is my recommendation that
alternatives two and three or some combination of the
two be pursued . . . .

(Letter from Thomas Mercer to Thomas Wilcox of July 11, 1985 at 2-3.) (emphasis

added)

its attorneys and made representations to its insureds in direct contradiction to this legal advice.  The Court does not reach the issue of damages in this Order.

> **4.  BOC's  Non-Compliance  with  the  Florida  Claims Administration  Statute  Results  in  Waiver  of  Certain Coverage Defenses**

The  Florida  Claims  Administration  Statute,  Fla.  Stat.  § 627.426(2)  (1996),  provides in pertinent part:

> A liability insurer shall not be permitted to
> deny coverage based on a particular coverage
> defense unless: (a) Within 30 days after the
> liability insurer knew or should have known of
> the  coverage  defense,  written  notice  of
> reservation  of  rights  to  assert  a  coverage
> defense  is  given  to  the  named  insured  by
> registered or certified mail sent to the last
> known  address  of  the  insured  or  by  hand
> delivery.

In <u>AIU Ins. Co. v. Block Marina Investment, Inc.</u>, 544 So. 2d 998 (Fla. 1989), the Florida Supreme Court described the effect of this statute:

> We  do  not  believe  that  the  legislature
> intended,  by  the  enactment  of  section
> 627.426(2), to give an insured coverage which
> is expressly excluded from the policy or to
> resurrect  coverage  under  a  policy  or  an
> endorsement  which  is  no  longer  in  effect,
> simply because an insurer fails to comply with
> the terms of the aforementioned statute.

544 So. 2d at 999; <u>see also</u> <u>Doe v. Allstate Ins. Co.</u>, 653 So. 2d 371, 373 (Fla. 1995) (reaffirming principles explained in <u>AIU</u>).

The <u>AIU</u> court found such intent consistent with the general rule that "while the doctrine of estoppel may be used to prevent a forfeiture of insurance coverage, the doctrine may not be used to create or to extend coverage." <u>Id.</u> at 1000 (citing <u>Crown Life Ins. Co. v. McBride</u>, 517 So. 2d 660 (Fla. 1987)). Therefore, an insurer who fails to comply with the statute where express policy exclusions are at issue or where there is no valid policy in effect will not be estopped from denying coverage on those bases.[13] <u>See generally</u> <u>AIU</u>, 544 So. 2d at 999-1000; <u>Country Manors Ass'n, Inc. v. Master Antenna Sys., Inc.</u>, 534 So. 2d 1187, 1195 (Fla. 4th Dist. Ct. App. 1988); <u>United States Fidelity and Guaranty Co. v. American Fire & Indemnity Co.</u>, 511 So. 2d 624, 625 (Fla. 5th Dist. Ct. App. 1987).

Stated in the affirmative, "Section 627.426(2), by its express terms, applies to a denial of coverage 'based on a particular coverage defense,' and in effect works an estoppel." <u>AIU</u>, 544 So.

---

[13] Two exceptions to this rule have been noted. In <u>Crown Life Insurance Company v. McBride</u>, 517 So. 2d 660, 662 (Fla. 1987), the Supreme Court held that promissory estoppel principles were properly applied to create insurance coverage in the presence of fraud or other injustice. <u>AIU</u>, 544 So. 2d at 1000 & n.1. In addition, the Fourth District Court of Appeal approved the use of estoppel where an insurer undertook to defend an insured with knowledge of facts upon which it could deny coverage and where the insured suffered prejudice thereby. <u>See</u> <u>Cigarette Racing Team, Inc. v. Parliament Ins. Co.</u>, 395 So. 2d 1238 (Fla. 4th Dist. Ct. App. 1981); <u>Doe v. Allstate Ins. Co.</u>, 653 So. 2d 371, 373-74 (Fla. 1995) (reconciling <u>Crown</u> with <u>Cigarette Racing Team</u>).

2d at 1000.  For example, an insurer will be estopped from denying coverage where it has failed to comply with the statute with respect to a coverage defense based on a breach of a condition of the policy.  AIU, 544 So. 2d at 1000.  See also Florida Physicians Ins. Co. v. Stern, 563 So. 2d 156, 158-59 (Fla. 4th Dist. Ct. App. 1990) (applying estoppel to late notice coverage defense); Auto-Owners Ins. Co. v. Brockman, 524 So. 2d 490, 493 (Fla. 5th Dist. Ct. App. 1988) (same).

Numerous courts have agreed that "Florida law requires strict compliance with [S]ection 627.426(2)" in order for insurers to retain their right to assert coverage defenses such as the one asserted by BOC.  See, e.g., Country Manors Ass'n, Inc. v. Master Antenna Sys., Inc., 534 So. 2d 1187, 1194 (Fla. 4th Dist. Ct. App. 1988) (citing Auto Owners Ins. Co. v. Salvia, 472 So. 2d 486, 488 (Fla. 5th Dist. Ct. App. 1985)).  Substantial compliance is insufficient.  See Country Manors, 534 So. 2d at 1194; Auto-Owners Ins. Co. v. Brockman, 524 So. 2d 490, 493 (Fla. 5th Dist. Ct. App. 1988) (finding a failure of compliance with respect to Section 627.426(2)(b)(2)); see also Gulf Ins. Co. v. Dolan, Fertig and Curtis, 433 So. 2d 512, 514 (Fla. 1983) (noting that an occurrence policy, like the one issued to Curtis and Miami Battery in this

47

case, is "a policy in which the coverage is effective if the negligent act or omission occurs within the policy period, regardless of the date of discovery or the date the claim is made or asserted").

The Court finds that BOC has waived certain affirmative defenses due to noncompliance with section 627.426. It is undisputed that Defendant BOC did not send Plaintiffs a written notice of reservation of rights within thirty days of receipt of notice of the pending litigation. BOC concedes that it received notice of the pending EPA/DER actions, by letter dated September 3, 1983. (Def.'s Resp. Mot. Summ. J. ¶ 12.) BOC asserts a letter dated June 5, 1984, entitled "Reservations of Rights Letter to Insured," operates to satisfy section 627.426(a). However, the Court finds this letter was not sent within the 30-day limit and does not otherwise meet the requirements of section 627.426(a). In addition, BOC corporate representative Michael Carozza, when asked whether the BOC decision to defend and indemnify was made "without a reservation of right[s]," responded, "It was done without." (Carozza Dep. at 157-58; see also id. at 171-72, & 188.)

Based on the record evidence in this case, the Court finds that BOC failed to comply with section 627.426(a). Accordingly,

BOC may not "declare a forfeiture of coverage . . . based on a breach of a condition of the policy." The Court finds that all affirmative defenses in BOC's Answer pertaining to such have been waived and shall be stricken. BOC shall be similarly precluded from arguing substantial compliance with § 627.426 -- a defense not recognized under Florida law. See Country Manors Ass'n, Inc. v. Master Antenna Sys., Inc., 534 So. 2d 1187, 1194 (Fla. 4th Dist. Ct. App. 1988).


**IV.  Conclusion**

The Court has clarified certain previous orders, granted nunc pro tunc Plaintiffs' motion to file an amended complaint, and determined that Plaintiffs' state a third-party insurance claim under Florida law. The Court has further found that BOC had a duty to defend the EPA, DER and Transformer litigations under three of the policies at issue, and that BOC breached its duty to defend under these three policies. Moreover, through noncompliance with Fla. Stat. § 627.426(a), the Court determines BOC shall be precluded from stating as affirmative defenses breach of condition of the policy or substantial compliance. The Court reserves ruling on the other policies at issue, and reserves on the question of damages. The Court shall set this case for a mediation conference

before Magistrate Judge Turnoff.

It is therefore,

**ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' September 1, 1998 Motion for Reconsideration is **GRANTED** in accordance with this Order.  The May 14, 1998 Order shall be **AMENDED** accordingly.

2. Plaintiffs' Motion for Leave to File an Amended Complaint, filed January 12, 1999 is **GRANTED** nunc pro tunc to February 16, 1999.

3. Plaintiffs' Motion for Partial Summary Judgment, filed April 20, 1998 on the issues of duty to defend, breach of the duty to defend, and noncompliance with section 626.426 is **GRANTED** in accordance with this Order.  The Court reserves on certain policies not discussed herein and also on the issue of damages.

4. Plaintiffs' Motion to File Additional Documents, filed March 17, 1999, is **GRANTED**.

5. Plaintiffs' Motion for Status Conference, filed April 20, 1999 is **DENIED** without prejudice.

6. Discovery in this case is reopened for a period of 45 days.

7. Plaintiffs' may file any amended complaint within 20 days

of the date of this Order.  Defendants' shall file an answer to this amended complaint within 10 days of its filing, or if no further complaint is filed by Plaintiffs, Defendants shall file an Amended Answer within 30 days of the date of this Order in accordance with the above analysis.

8.   The Parties shall meet for a mediation conference with Magistrate Judge William C. Turnoff.  Judge Turnoff shall set such conference at his earliest convenience.

9. All pending motions not otherwise ruled upon in this Order are **DENIED WITHOUT PREJUDICE**.  Leave is freely granted to refile any such motion.

**DONE AND ORDERED** in Chambers at Miami, Florida this 28 day of April, 1999.

JOAN A. LENARD
**UNITED STATES DISTRICT JUDGE**

cc:   Derek Spilman, Esq.
      4215 Miller Dr.
      St. Petersburg, FL 33706-2650

      Richard Lumpkin, Esq.
      Ver Ploeg & Lumpkin
      100 SE 2nd St., Ste. 2150
      Miami, FL 33131-2154

      Joseph Matthews, Esq.
      Colson Hicks et al.
      200 S. Biscayne Blvd., 47th Fl.
      Miami, FL 33131

      Joseph Glass, Esq.
      Duplass Witman et al.
      3838 N. Causeway Blvd., Ste. 2900

      Metairie, LA 70002

      G. Bartman Billbrough
      Cole White & Bollbrough
      1390 Brickell Ave., 3rd Fl.
      Miami, FL 33131

      Jeffrey Shapiro
      Keith Mack LLP
      200 S. Biscayne Blvd., 20th Fl.
      Miami, FL 33131

      Robert Gilbert, P.A.
      133 Sevilla Ave.
      Coral Gables, FL 33134

51

Jeffrey P. Shapiro, Esq.
Keith Mack LLP
200 S. Biscayne Blvd., 20th Fl.
Miami, FL 33131-5633

Maria Beguirstain, Esq.
Kenny Nachwalter et al.
201 S. Biscayne Blvd., Ste. 1100
Miami, FL 33131-4327